UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GREAT RIVERS HABITAT ALLIANCE et al.,     )
                                          )
          Plaintiffs,                     )
                                          )
     vs.                                  )          Case No.   4:05CV01567 ERW
                                          )
U.S. ARMY CORPS OF ENGINEERS et al.,      )
                                          )
          Defendants.                     )

**MEMORANDUM AND ORDER**

This matter comes before the Court upon Defendant St. Peters's Motion for Summary

Judgment [doc. #27], Defendant United States Army Corps of Engineers' Motion for Summary

Judgment [doc. #29], Plaintiff Missouri Coalition for the Environment Foundation's Motion for

Summary Judgment [doc. #32], Plaintiff Great Rivers Habitat Alliance's, Baldwin Land Company's,

and Over and Under Land Company's Motion for Summary Judgment [doc. #35], and Plaintiff City

of O'Fallon's Motion for Summary Judgment [doc. #36].

**I.     BACKGROUND FACTS**

This case involves a challenge by Plaintiffs to a decision by Defendant Army Corps of

Engineers ("Corps") to issue a Section 404 Permit ("Permit")[1] to Defendant City of St. Peters

_____

[1]The Clean Water Act ("CWA") prohibits the discharge of pollutants into the nation's
waterways unless a permit has been obtained. 33 U.S.C. § 1311. The Secretary of the Army,
acting through the Corps, has authority to issue permits for the placing of "dredged or fill"
material into wetlands and other waters which are subject to the CWA. 33 U.S.C. § 1344. The
Environmental Protection Agency, in consultation with the Corps, is charged with developing
regulations governing the issuance of 404 permits. 33 U.S.C. § 1344(b). These regulations are
known as the "404(b)(1) Guidelines," and they set forth criteria that must be met before dredged

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

("City").  For the past several years, the City has been taking steps to develop a proposed mixed-use

area known as Lakeside Business Park, which it hopes will include office, warehouse, manufacturing,

dining, entertainment, hotel, conference, cultural, and recreational uses ("Project").  The Project

includes construction of a 500-year levee, two storm water pumping stations, storm-water drainage

channels and detention basins, and road improvements.[2]  The Project is located in a floodplain[3] and

contains wetland areas,[4] necessitating certain authorizations from various federal and state agencies

before alteration from a natural condition may be made.  One of these required authorizations must

come from the Corps.[5]   Thus, on October 16, 2003, the City applied to the Corps for a Permit to

allow it to fill wetlands and other waters in the Project area.

On December 31, 2003, the Corps issued its first Public Notice for the Project, and invited

public comments.  Sixty-nine commenters responded to the initial Public Notice.  The Corps

subsequently determined that a public hearing would be beneficial, and a public hearing was

conducted on October 21, 2004.  One hundred ninety-one written comments were presented at the

---

or fill material can be placed in wetlands or other waters.  *See* 40 C.F.R. § 230.1.

[2]Plaintiffs state that the land that will be enclosed by the proposed levee was under between 13 and 17 feet of water during the 1993 St. Louis flood.

[3]A floodplain is "a flat or nearly flat surface that may be submerged by floodwaters." *Webster's Third New Int'l Dictionary* 873 (1993).

[4]A wetland is "land containing much soil moisture (as swamp or bog)."  *Id.* at 2598.

[5]In addition to approval from the Corps, the Project must also gain approval from the Federal Emergency Management Agency ("FEMA") because a significant portion of the levee segment that would be north of Highway 370 is in the "regulatory floodway" of the Mississippi River.  Apparently, the City has applied to FEMA for a Conditional Letter of Map Revision to accommodate the Project and, without this approval, the Project will have to be moved out of the regulatory floodway.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

hearing or during the comment period following the hearing, and sixty-five commenters made oral statements at the hearing. Comments were submitted by agencies, advocacy groups, and individuals.[6] On July 25, 2005, the Corps completed its Permit Evaluation and Decision Document ("Decision Document"), which contains the Corps' Environmental Assessment ("EA"), Statement of Findings, and review and compliance determination. Upon determining that the Project will not have a significant impact on the quality of the human environment, the Corps issued its Finding of No Significant Impact ("FONSI") and determined that a more detailed Environmental Impact Statement ("EIS") was not required. On August 16, 2005, the Corps issued the Permit, conditional upon the City's receipt of a Water Quality Certification from the Missouri Department of Natural Resources. The Water Quality Certification was issued on September 8, 2005, and the Corps validated the Permit on September 9, 2005, after which time the City began work on the Project.

On September 27, 2005, Plaintiffs filed the instant suit pursuant to the Administrative Procedures Act ("APA"), alleging that the decision to issue the Permit was arbitrary, capricious, an abuse of discretion, or otherwise not lawful. At that time, Plaintiffs moved for a Temporary Restraining Order. A hearing on Plaintiffs' request for temporary relief began on September 27, 2005 and was continued to September 29, 2005. On September 30, 2005, Plaintiffs' request for temporary relief was denied. On October 21, 2005, the Corps filed the Certified Administrative Record in this case. The parties now bring cross-motions for summary judgment.

_____

[6]These commenters included the Environmental Protection Agency, the Fish and Wildlife Service, the Missouri Department of Conservation, and the Missouri Department of Transportation, among others. As Plaintiffs point out, several agencies and individuals, including the U.S. Fish and Wildlife Service, the U.S. Environmental Protection Agency, and the mayor of St. Peters, were opposed to the Project for various reasons.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

## II.      SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986). The United States Supreme Court has noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Id*.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 249. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone*

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

*Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## III.    DISCUSSION

Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*, Plaintiffs seek judicial review of the Corps' decision to issue the Permit. Under the APA, a reviewing court must uphold an agency action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Importantly, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)). The scope of review is narrow, and the reviewing court must not substitute its judgment for that of the agency. *Cent. S.D. Coop. Grazing Dist. v. Sec'y of U.S. Dep't of Ag.*, 266 F.3d 889, 895 (8th Cir. 2001). The reviewing court "'must consider whether the decision was based on a consideration of the relevant factors and whether there

5

has been a clear error of judgment.'" *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). In short, a court may not "supply a reasoned basis for the agency's action that the agency itself has not given," but a court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (internal quotation marks omitted). An agency is not required to furnish detailed reasons for its decision, but should provide a rationale "sufficiently clear so that a court is not required to speculate as to its basis." *O-J Transp. Co. v. U.S.*, 536 F.2d 126, 130 (6th Cir. 1976). Importantly, a court may not set aside an agency's decision merely because the court is unhappy with the result reached or because the court would have reached a different decision had it been the decision-maker. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

A.    Counts I, II, and III

The first three counts of the Complaint are based on an allegation that, in making the Permit decision, the Corps failed to properly consider and evaluate practicable alternatives to the proposed Project, in accordance with its duty to do so. In Count I, Plaintiffs allege that the Corps failed to properly carry out its responsibilities under the Clean Water Act ("CWA") and applicable regulations by not requiring the City to choose a practicable alternative to the proposed Project that would have caused less damage to the aquatic environment. Compl. ¶ 72. In Count II, Plaintiffs allege that the Corps failed to properly consider practicable alternatives that would have avoided or minimized impacts to the floodplain, as required by the Corps' permitting regulations. Compl. ¶ 81. Finally, in Count III, Plaintiffs allege that the Corps failed to consider practicable alternatives to building in the floodplain, as required by Executive Order 11988. Compl. ¶ 87.

6

In making its permitting decision, the Corps is required to consider practicable alternatives. The CWA regulations state that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Importantly, for projects which are not "water dependent," practicable alternatives "are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). In addition to considering practicable alternatives which would have less adverse impact on the aquatic ecosystem, practicable alternatives to building in a floodplain must also be considered. The regulations governing the Corps' permitting process state that it "should avoid authorizing floodplain developments whenever practicable alternatives exist outside the floodplain. If there are no such practicable alternatives, the district engineer shall consider, as a means of mitigation, alternatives within the floodplain which will lessen any significant adverse impact to the floodplain." 33 C.F.R. § 320.4(l)(3). Further, Executive Order 11988 directs federal agencies to consider practicable alternatives to developing in floodplains. Executive Order 11988 § II(a)(2) (1977).

Plaintiffs first argue that the Corps erred in its practicable alternatives analysis because it defined the project's purpose too narrowly, thereby manipulating the project purpose to exclude alternative sites. Defendants counter that the project purpose was adequately defined and that it properly took into account the City's objectives. "Central to evaluating practicable alternatives is the determination of a project's purpose." *Nat'l Wildlife*, 27 F.3d at 1345. "While the Corps may not

manipulate the project purpose so as to exclude alternative sites, 'the Corps has a duty to take into account the objectives of the applicant's project.'" *N.W. Envl. Def. Ctr. v. Wood*, 947 F. Supp. 1371, 1377 (D. Or. 1996) (quoting *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989)).[7]

In this case, the Corps determined that "[t]he purpose and need of the project is to construct a new levee providing flood protection to a proposed development area known as Lakeside Business Park . . . for the creation of a new mixed-use development area that would include office/warehouse, manufacturing, office, dining/entertainment, hotel/conference, cultural and recreational uses." A.R. Tab1-F, pp. 4-5. The Corps further determined that the following criteria were "necessary to implement the desired plan": (1) located in the City; (2) a total area of approximately 1,200 to 1,400 acres; (3) not be adjacent to substantial residential areas; (4) a "usable" area of approximately 500 to 800 acres, excluding rights-of-ways, open space, environmentally unavailable areas, drainage areas, and utilities; and (5) located on an interstate highway or major thoroughfare close to a major intersection with good connections to existing highway arteries. A.R. Tab 1-F, pp. 5-6.

The Corps' statement of the project purpose, including the five criteria deemed necessary to implement the project plan, appears to be based primarily on a report entitled "Practicable Alternatives Analysis for the Proposed City of St. Peters Lakeside Business Park" ("PAA"), authored by McKinney Associates, one of the City's consultants.[8] The PAA states that, after years of study,

---

[7]In *dicta*, the Eighth Circuit has admonished that developers should not be permitted to "artificially constrain the Corps' alternatives analysis by defining the project's purpose in an overly narrow manner." *Nat'l Wildlife*, 27 F.3d at 1346.

[8]On July 2, 2004, McKinney Associates of Chesterfield, Missouri, submitted the PAA to the Corps on the City's behalf.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

the City has concluded that a large multi-use business park is the best means of enabling it to take advantage of the recently completed Missouri Route 370/I-70 interchange, which has provided access to a part of the City not previously accessible. The PAA points to the City's desire for "rational and sensible economic growth" and its desire to acquire a "suitable site" for future business development. A.R. Tab 1-E, p. 3. The PAA relays the City's conclusion that current conditions "offer a unique opportunity to increase and diversify the City's tax base, provide for many new jobs in the City, and accommodate the need for future, sound diversification of economic opportunities in the City." A.R. Tab 1-E, p. 3. The PAA identifies certain "primary" and "secondary" site criteria believed to be necessary to carry out the Project's goals.[9] Conclusions made in the PAA appear to be based on earlier studies obtained by the City as it considered how best to provide for its own economic growth. These studies include: (1) a "Competitive Analysis 2004 Report," commissioned by the Economic Development Center of St. Charles County, comparing various site selection factors and drawing certain conclusions concerning the particular strengths and weaknesses of St. Charles County;[10] (2)

---

[9]The PAA lists five "primary" criteria: (1) located within the City of St. Peters; (2) consisting of about 1,200-1,400 acres or more to allow for the creation of a new mixed-use business park to include cultural, recreational, office/warehouse, manufacturing, office, dining/entertainment, and hotel/conference areas; (3) not adjacent to substantial residential areas; (4) developable area of approximately 500-800 acres; and (5) located on an interstate highway or major thoroughfare of at least four lanes and close to a major intersection with good connections to existing highway arteries.

The PAA also lists nine "secondary" criteria: (1) room for offsets, landscaping, parking, driveways, and outlying sites; (2) room for storm water drainage; (3) located within a reasonable distance from a major airport; (4) access to existing rail lines; (5) locations on-site for ancillary, synergistic business such as restaurants and banks; (6) good site visibility from the highway; (7) site topography such that synergistic development would be permitted, with ready access between all areas of the project; (8) access to all necessary utilities; and (9) zoning to permit these purposes. A.R. Tab 1-E, pp. 3-4.

[10]Among other conclusions, the report indicates that there is a need for St. Charles County to provide more large development sites to remain competitive in the site selection process. A.R.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

a "Market and Land Absorption Projections," which outlines the economic basis for new land development opportunities in St. Peters;[11] and (3) a "St. Peters Route 370 Tax Increment Financing Redevelopment Plan," the purpose of which was to identify the major infrastructure improvements, including the levee, that the City believed would be necessary to ensure future development opportunities in the Highway 370 corridor.[12]

---

Tab 2-B, p. 22-23.

[11]According to the report, "[t]he recent completion of Route 370 and its interchange with Interstate 70 in the City of St. Peters opens potential new land development opportunities. The new highway provides major vehicular access to parts of the city not previously so available." A.R. Tab 2-F, p. 2. The report explains that "[j]ob growth in the City of St. Peters will be dependent on job growth within St. Charles County as well as on the availability of developable land and building space" and predicts that the number of jobs located in St. Peters could double over the next twenty years. A.R. Tab 2-F, p. 6. The report states that the number of workers in the City could grow by 12,000 between the years 2000 and 2020 and predicts that the resulting increase in necessary commercial floor area would require between 1,300 and 1,450 acres of land. A.R. Tab 2-F, p. 13. The report concludes that, based on this projection, the proposed business park could become occupied. A.R. Tab 2-F, p. 13. The report also states:

> Given that the Route 370 location has roughly 1,100 gross acres (again, depending on the location of a levee), the projected floor area growth in St. Peters over the next 20 years could absorb such a quantity of land. This is certainly true if the developable land area is relatively small, such as the 800 acres inside of Route 370. Encouraging growth in that sector would require about two-thirds of the projected growth, leaving the remainder for other locations in the city. In fact, it would not be wise to have only one possible location for economic development, so other parts of the city should also be made available for similar kinds of uses. If the entire 1,100 acres becomes developable, there would likely be sufficient floor area demand to accommodate that scale within a 20-year time frame, but only barely (within a margin of error) particularly if other areas of the city are also to be offered as alternative sites for prospective developers and businesses.

A.R. Tab 2-F, p. 14.

[12]According to the report, the City believes that "[t]he Redevelopment Area represents the last major opportunity to provide for this type of development in an appropriate setting within the City of St. Peters. Therefore, this development is vital for the long-term economic health and viability of St. Peters." A.R. Tab 2-D, p. 1. The report states the need for flood protection of the area. *See* A.R. Tab 2-D, p. 7, 9, C-2. The report describes the general land use plan as "envision[ing] a mixed-use development incorporating office/warehouse,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

In this case, the Corps had a duty to take into account the objectives of the City's proposed project, and those objectives appear to have come about through a process of detailed study prior to seeking the Permit from the Corps. In planning for future job growth and development needs, the City concluded that a large tract on which a mixed-use business park could be located was the most sound way to bring about sensible and strategic growth. The project purpose is not arbitrarily defined and does have support in the record.[13] The Corps properly defined the project purpose in accordance with the City's stated development objectives. The Court cannot conclude that the project purpose was defined in an overly narrow manner merely as a pretense for excluding other alternatives or artificially constraining the Corps' alternatives analysis. Thus, this case does not appear to run afoul of the Eighth Circuit's warning in *National Wildlife*. *See Nat'l Wildlife*, 27 F.3d at 1346 (in *dicta*, stating that developer should not be permitted to define project in overly narrow manner). The Corps' statement of the project purpose was not arbitrary, capricious, an abuse of discretion, or

_____

manufacturing/distribution, office, dining/entertainment, retail, hotel/conference space, cultural and recreation uses." A.R. Tab 2-D, p. 9. The report emphasizes that private businesses will not locate in the area if it remains unprotected from flooding. A.R. Tab 2-D, p. C-2.

[13]Plaintiffs argue that the studies upon which the City relies actually contradict the City's assertion that a large business park is needed. Plaintiffs believe that sufficient economic growth can be achieved through the use of smaller, scattered developments. While it is true that the "Market and Land Use Absorption Projections" states that it would not be wise to have only one possible location for economic development, other information provided by that report along with conclusions of the additional reports support the City's determination that developing a large contiguous site is the best means of generating the greatest potential for job growth.

Plaintiffs appear to believe that the City has taken an overly optimistic view of its potential for growth and that, in formulating the project purpose, it selectively considered only that information supporting its idea that a large business park is the best means of achieving strategic growth. While the Court is sympathetic to Plaintiffs' view regarding this issue, it is nonetheless true that the Record supports the City's determination. The Court cannot set aside the Corps' decision merely because it is unhappy with the result reached by the Corps. *See Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 558.

otherwise not in accordance with the law.

2.    *Consideration of Practicable Alternatives*

After determining the project purpose, the Corps must consider any alternatives "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). "In evaluating whether a given alternative site is practicable, the Corps may legitimately consider such facts as cost to the applicant and logistics." *Sylvester*, 882 F.2d at 409. The scope of the alternatives analysis should reflect the seriousness of the potential for adverse environmental impacts. *See* 40 C.F.R. § 230.6(b); 40 C.F.R. § 230.10.[14] Although the Corps may rely on information provided by the applicant, it should not merely uncritically accept the applicant's assessment as to practicable alternatives. *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1270 (10th Cir. 2004) (citing cases). In this case, the relevant inquiry is whether the Corps' decision that the City had clearly demonstrated a lack of practicable alternatives was a clear error of judgment. *See Alliance for Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 543 (M.D.N.C. 2004). In this case, the City had the burden of clearly demonstrating to the Corps that, given cost, technological, and logistical considerations,

---

[14]According to 40 C.F.R. § 230.6:

> The Guidelines user, including the agency or agencies responsible for implementing the Guidelines, must recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. The level of documentation should reflect the significance and complexity of the discharge activity.

40 C.F.R. § 230.6(b). Similarly, a Note at the beginning of § 230.10 states:

> Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

40 C.F.R. § 230.10, Note. *See also Sierra Club v. U.S. Army Corps of Eng'rs*, 2005 WL 2090028 at *12 (Aug. 29, 2005) (explaining application of these regulations).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

its project purpose could not be achieved on an alternative site, or in an alternative manner within the preferred site, with less damage to the aquatic ecosystem or floodplain.

The Administrative Record makes clear that the Corps required the City to undertake a formal practicable alternatives analysis.[15]  First, the PAA considered five sites, including the proposed site, and evaluated them in reference to the project purpose.  The PAA concluded that the alternative sites failed to meet the project purpose for various reasons, including being too small, too costly to develop, or too close to residential areas.[16]  A.R. Tab 1-E, pp. 4-5.  Next, the PAA considered a "no-action" alternative, which was rejected as negating the City's objectives for stimulating the current and future economic growth of the City, rendering the Board of Aldermen remiss in their duties for failing to address the need to provide for additional jobs and more commercial floor area.  A.R. Tab 1-E, p. 5.  Then, the PAA considered two "no-levee" alternatives,[17] which were rejected for various reasons, including problems that would stem from having a smaller development area and cost-prohibitive issues that would arise if the site were filled instead of being levee-protected.[18]  A.R. Tab

---

[15]The Introduction to the PAA notes that the Corps "specifically requested an alternatives analysis" after receiving comments requesting further information regarding alternatives.  A.R. Tab 1-E, p. 2.

[16]According to the PAA, Area 1 met one primary criteria of being within the City limits, but it was too costly to develop and its size too limited.  Area 2 met three of the primary criteria, but the site was too small.  Area 3 met three of the primary criteria, but was found to be too small to afford any appreciable development opportunities.  Area 4, the preferred alternative, met all five of the primary criteria.  Finally, Area 5 met two of the primary criteria, but was found to be too small and adjacent to residential areas.

[17]The "no-levee" alternatives were considered in accordance with a suggestion by the Corps.  A.R. Tab 1-E, p. 5.

[18]The first no-levee alternative considered developing only a portion of the area.  It was rejected because: (1) developing only a portion of the site would not have afforded sufficient area for development to meet the City's basic objectives of creating the requisite number of new jobs;

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1-E, p. 6. Finally, the PAA considered three alternative levee alignments within the proposed site. A.R. Tab 1-E, pp. 6-8. These alternative levee alignments were rejected for various reasons, including because they would require the use of property not in the City, would create logistical hauling problems, would create problems incorporating a levee into Highway 370, would provide inadequate protected area for development, would infringe upon the Missouri Department of Transportation ("MDOT") right-of-way and embankment, would create traffic flow problems, and presented engineering and maintenance concerns. A.R. Tab 1-E, pp. 7-8.

In addition to the formal practicable alternatives analysis performed on behalf of the City, the Corps had the benefit of public comments concerning the Project, many of which concerned practicable alternatives. On December 31, 2003, the Corps issued a Public Notice inviting comments on the Project. A.R. Tab 1-C. On September 21, 2004, the Corps issued a second Public Notice announcing that a hearing would take place for the purpose of "gather[ing] additional public review and comment on the original public notice that was issued." A.R. Tab 1-D, p. 1. This second notice also stated that additional written statements would be accepted for a period of time following the public hearing. A.R. Tab 1-D, p. 2. On October 21, 2004, the Corps held a public hearing at which over 100 interested parties made oral and written comments. Those submitting comments included federal and state agencies; federal, state, and local elected officials; and the general public. A.R. Tabs

and (2) piecemeal development would not provide the same kind of synergy available from a business park large enough to attract the desired type of companies and would result in a loss of the economies-of-scale needed to address the infrastructure requirements for the larger area. A.R. Tab 1-E, p. 6.

The second no-levee alternative considered filling the entire site, except for the waterways and wetlands, to the 500-year elevation plus three feet. This alternative was rejected because it was cost-prohibitive and because of resulting problems with large areas set aside to offset the waterways and traffic problems. *Id.*

14

3-A, 3-B, 3-C, 4-A. Many of these comments addressed alternatives to the proposed site and alternative development configurations within the proposed site that the commenters believed would lessen potential environmental impacts.[19] The City provided a response to these comments. *See* A.R. Tab 1-H, pp. 5-7 (discussing practicable alternatives).

The Court first considers the practicable alternatives analysis as it relates to alternative development sites. In the EA, the Corps determined that the City had satisfied its burden of clearly demonstrating an absence of practicable alternative sites.[20] After describing the five sites identified and considered by the City in the PAA, the Corps concluded that four of the five potential sites were not practicable alternatives for various reasons, including that the alternatives contained jurisdictional waters, suspect or actual wetlands areas, were too small, were too costly to develop, or were too close to residential areas. A.R. Tab 1-F, pp. 6-7. In addition to the PAA provided by the City, the Corps also considered the "Available Alternative Site Study for City of St. Peters Missouri," which was prepared by Organizational Real Estate Solutions, LTD on behalf of Plaintiff Great Rivers

---

[19]Comments from Plaintiff Great Rivers Habitat Alliance were received by the Corps. The submission included the following elements: (1) Available Alternative Site Study for City of St. Peters, Missouri; (2) Hydraulic Analysis Report by Clayton Engineering Company; (3) petitions against the levee project; (4) a letter in opposition to the project from Great Rivers Habitat Alliance; (5) a study regarding the flooding of Dardenne Creek; (6) a hydrology study of Belleau Creek by Hoelscher Engineering; and (7) wetland comments by Gaylord Memorial Laboratory. A.R. Tab 5-B.

[20]According to the EA, the Corps and the City "considered and evaluated alternatives prior to and during the course of th[e] permit evaluation." A.R. Tab 1-F, p. 5. It appears to the Court that the scope of the practicable alternatives analysis reflects the seriousness of the potential environmental impact of the Project. The impacts to jurisdictional waters of the United States for the Project total 55.6 acres consisting of: (1) 4 acres of wetlands; (2) 42.5 acres of open waters; and (3) 9.1 acres of tributary impacts. A.R. Tab 1-F, p. 2. The largest portion of the open waters acreage total is a 40.4 acre impact to a MDOT borrow lake, which was created in conjunction with the construction of nearby Highway 370.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Habitat Alliance (the "ORES Study"). *See* A.R. Tab 1-F, p. 8 (describing the ORES Study found at

A.R. Tab 5-B[21]). The purpose of the ORES Study was to assess available real estate in the City for

consideration as available alternatives to the proposed project site. A.R. Tab 5-B, ORES Study, p.

2. The ORES Study concluded that over 1,200 acres of land were vacant, unlisted for development,

and suitable for building in St. Peters. A.R. Tab 5-B, ORES Study, p. 21. Fifty-four tracts were

identified, ranging in size from 2 acres to 109 acres, with an average size of 23 acres. A.R. Tab 5-B,

ORES Study, p. 21. An additional 300 acres of land were found to be currently listed for

development within the City. A.R. Tab 5-B, ORES Study, p. 22. The Corps considered these

alternative sites and concluded as follows:

> The sites were considered, but rejected as not meeting the specific site criteria put
> forth by the City that had been established as necessary for the planned development.
> The proposed sites were either too small, or were zoned for purposes other than
> industrial-commercial because they are not suitable for such uses. The City, mindful
> of the need for future space for retail and residential, sought to locate the planned
> development in an area away from existing and logical residential areas. Planners
> realize that retail and residential areas need to be proximate to each other, and that
> industrial-commercial developments do not coexist well with residential. The
> proposed sites also contained flood plain development, and jurisdictional water
> bodies. The jurisdictional waters in the proposed areas included wetlands, tributaries,
> lakes and ponds. Some of the sites included wetland habitat such as remnant oxbows
> and Dardenne Creek. Impacts to jurisdictional waters in any of the proposed sites
> would require 404 permit authorization from the Corps. Some of the proposed sites
> contain jurisdictional waters in locations such that avoidance would be difficult, if not
> impossible.

A.R. Tab 1-F, p. 8. The Corps concluded that the proposed site was the only practicable, available

site meeting the City's goals for future development. A.R. Tab 1-F, p. 8.

---

[21]The referenced study is found approximately one-third of the way through the
documents located at Tab 5-B. The study is not paginated. For ease of reference, the Court will
refer to this study as the "ORES Study" and will indicate page numbers as if each page of the
ORES Study were numbered in chronological order.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiffs believe that a practicable alternative site is available and that the City failed to meet its burden of demonstrating to the Corps that the Project could not be located at an alternative location. Plaintiffs appear to believe that a large business park development is not desirable or necessary for successful economic development in the City and that successful economic development could take place by using a combination of alternative, smaller sites. As is apparent from the Administrative Record, this view was considered by the Corps. The Corps considered alternatives in light of cost, logistics, technology, and the overall project purpose, and the Court cannot say that the Corps committed a clear error of judgment in concluding that the City had clearly demonstrated a lack of available alternative sites. The Corps considered and rejected proposed practicable alternative sites in accordance with its duties under the law and articulated reasons for its decision as to practicable alternatives. The Corps' decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

Next, the Court considers the practicable alternatives analysis as it relates to alternatives within the preferred site. Specifically, the EA explains that "[w]ithin the preferred alternative site, the City considered three main levee alignments, identified as Alternatives A, B, and C in their Alternatives Analysis." A.R. Tab 1-F, p. 8. The Corps rejected Alternative A because it "caused the greatest impact to the floodway, required that a conveyance lake be created north of Dardenne Creek, had property acquisition issues, and created logistical problems in acquiring fill for the levee." A.R. Tab 1-F, p. 8. Alternative C was rejected because "it had serious problems associated with incorporating the levee into the sand embankment of Route 370 embankment [sic], infringed upon MDOT right-of-way, and provided inadequate area for development." A.R. Tab 1-F, p. 9. The

Corps then noted that further alternative designs were considered.[22] The Corps rejected these alternative designs for various reasons, including MDOT right-of-way and embankment infringement, problems with a planned continuous circulation road, the effect on the layout and function of the outer road, and interference with future development plans. A.R. Tab 1-F, p. 9. Finally, the Corps considered the City's "no-levee" alternatives, and concluded that these would not be practicable because they were cost prohibitive, created traffic problems, or would require piecemeal development not in accordance with the City's project purpose. A.R. Tab 1-F, pp. 9-10. Plaintiffs argue that an alternative levee alignment would have a lesser impact on the aquatic environment and floodplain. According to Plaintiffs, the Corps unlawfully rejected the proposed alternative levee alignments in an arbitrary manner because "[e]very rationale that the Corps used to reject alternatives that would have less impact on the aquatic environment are either contradicted by, or unsupported by, the record." Pls. Mem. in Opp. at 15. Specifically, Plaintiffs take issue with the alternative analysis as it relates to the rejection of: (1) Alternative C, (2) the Figure 4 Realignment, and (3) the Undesignated Realignment. Plaintiffs argue that the Corps improperly excluded these alternatives as impracticable. In this case, the City had the burden of clearly demonstrating to the Corps that, given cost, technological, and logistical considerations, its project purpose could not be achieved in an alternative manner within the preferred site with less damage to the aquatic ecosystem and

_____

[22]The EA does not clearly identify these alternative alignments with titles. Two alternative designs are described as avoiding impacts to the MDOT borrow lake. The first is identified as "Figure 4," and the Court will refer to it as the "Figure 4 Realignment." The second alternative is not identified by name and will therefore be referred to as the "Undesignated Realignment." The EA states that other alternative designs were considered, but were rejected for various reasons. No party has raised an issue with respect to these other designs, and the Court will not address them.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

floodplain.[23]

## I.     Alternative C

The Alternative C levee alignment would have the levee built onto Route 370, Ramp 2, and the Spencer Road embankment, protecting about 1,190 acres. A.R. Tab 1-E, p. 7. It would have placed the levee further south than the preferred alternative. A.R. Tab 1-F, p. 9. According to the EA, "Alternative C was rejected as it had serious problems associated with incorporating the levee into the sand embankment[24] of Route 370 embankment [sic];[25] infringed upon MDOT right-of-way,[26] and provided inadequate area for development."[27] A.R. Tab 1-F, p. 9. Plaintiffs contend that

---

[23]The Corps appears to believe that the fact that there will be no net loss of wetlands in this project (due to mitigation requirements) is relevant to the alternatives analysis. *See* Corps' Mem. in Opp. at 8. To the extent the Corps believes this to be the case, the Corps is incorrect. While mitigation efforts are required, they should be considered after the Corps is satisfied that no practicable alternatives are available to the applicant. *See* § 230.10(a)(1).

[24]An embankment is "a structure (as of earth or gravel) raised usu[ally] to prevent water from overflowing a level tract of country, to retain water in a reservoir or a stream in its bed, or to carry a roadway or railroad." *Webster's Third New Int'l Dictionary* 738 (1993). The EA states that the existing Route 370 embankment is made of sand. Sand is "a loose material consisting of small but easily distinguishable grains usu[ally] less than two millimeters in diameter, most commonly of quartz resulting from the disintegration of rocks, and commonly used for making mortar and glass, as an abrasive, or for molds in founding." *Id.* at 2009.

[25]The Court has difficulty understanding this phrase as it is written. The Court presumes that it should read: ". . . incorporating the levee into the sand embankment of Route 370; infringed . . ."

[26]A right-of-way is "a legal right of passage over another person's ground" and can refer to "the strip of land devoted to or over which is built a public road." *Id.* at 1956 (1993).

[27]In its Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, the Corps states that Alternative C was also rejected because it would impede the flow of traffic. After examining the references to the Administrative Record provided in support of the Corps' contention, the Court is unable to find any support in the Record for the Corps' assertion that Alternative C was rejected because it would impede the flow of traffic.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Alternative C provides a practicable alternative to the preferred levee alignment and that it was arbitrarily rejected by the Corps.[28]  Plaintiffs argue:  (1) the rejection of Alternative C because of problems associated with incorporating the levee into the embankment of Highway 370 is arbitrary given that the preferred alternative has the levee tying into highway embankments in multiple locations; (2) the rejection of Alternative C on the basis that it infringes on the MDOT Highway 370 right-of-way constitutes an arbitrary decision given that the preferred levee alignment infringes on the same right-of-way; and (3) the Corps' assertion that Alternative C was rejected because it provided inadequate acreage for development is devoid of any factual basis in the record.  Defendants respond that Alternative C was rejected because it did not represent a practicable alternative, for the reasons set forth in the EA.

Although this Court might have come to a different conclusion had it been faced with the decision of whether to reject Alternative C, the Court cannot say that the Corps' rejection of Alternative C was arbitrary or a clear error of judgment.  Close review of the record reveals that the Corps did consider Alternative C and that the Corps was persuaded that it should be rejected.  First, Alternative C was rejected because it presented serious engineering problems in attempting to build a majority of the levee into the Route 370 sand embankment.  Plaintiffs' contention that the Corps' rejection was arbitrary is unpersuasive.  While it is true that the preferred alternative crosses the Highway 370 embankment in various locations, the Corps was entitled to determine that different and more serious levee construction, performance, and maintenance issues are presented by an alignment

---

[28]Plaintiffs contend that Alternative C would have substantially reduced the impact on floodplains and wetlands.  According to Plaintiffs, Alternative C would encompass only 250 fewer acres than the preferred levee alignment, would avoid the majority of the impacts to aquatic resources, would not be located in the regulatory floodway, and would cost substantially less to construct.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

running the entire length of the Highway 370 embankment.[29] Plaintiffs' characterization of this issue brushes over the nuanced engineering considerations at hand and invites the Court to substitute its judgment for that of the Corps. Second, Alternative C was rejected because it infringes on the MDOT right-of-way and embankment. Plaintiffs' contention that it was arbitrary to exclude Alternative C for this reason when the preferred alternative also infringes on the MDOT right-of-way in several places is also unpersuasive. The degree of infringement present in Alternative C appears to differ from that present in the other alternatives, and the Corps was entitled to take this into consideration when rejecting Alternative C.[30] Because the Corps did articulate two reasons for rejecting Alternative C which were not arbitrary,[31] the Court concludes that the Corps' rejection of Alternative C was not arbitrary, capricious, or otherwise not in accordance with the law.[32]

---

[29]In describing the proposed levee, the City's engineer stated that "[i]t is anticipated that the levee and berms will be constructed of clay materials." A.R. Tab 2-C, p. 12. It further stated that, "[d]uring the 1993 floods on the Mississippi and Missouri Rivers, engineered levees constructed of compacted clay materials generally performed much better than those constructed of uncompacted and semicompacted silts." A.R. Tab 2-C, p. 13. The engineer also stated that Alternative C was "less feasible" due to "the unconventional nature of incorporating a levee into the existing sand embankment of Route 370." A.R. Tab 2-C, p. 2.

[30]For example, the City's engineer noted that the "degree of coordination with the Missouri Department of Transportation" required for Alternative C made it "less feasible" than Alternative B. A.R. Tab 2-C, p. 2.

[31]Although the Court might wish for a more expansive discussion in the EA regarding the reasons for rejecting Alternative C, the Court recognizes that the Corps is not required to provide detailed explanations of its decision, so long as its path can be discerned. Though it presents a close question, the Court is unable to conclude that the explanation for rejecting Alternative C is so bare that the Court is required to resort to speculation.

[32]The Corps' third reason for rejecting Alternative C appears to lack any basis in the Record. As Plaintiffs correctly and astutely point out, the Alternative C alignment would have encompassed about 250 fewer acres than the preferred alignment. A.R. Tab 2-C, p. 16. It appears that the preferred alignment will produce a usable space of about 921 acres. A.R. Tab 1-F, p. 9. Even if the entire 250 acres is subtracted from the proposed 921 acres of usable space in

21

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

ii.    Figure 4 Realignment

In addition to Alternatives A, B, and C, the Corps also considered alternative levee realignments that would have modified the preferred levee alignment. The Figure 4 Realignment, which would have avoided some of the impact to the MDOT borrow lake,[33] was rejected because it "would infringe upon the MDOT highway 370 right-of-way and embankment . . . [and] it would not be possible to have a continuous circulation road north of Highway 370, which is essential for efficient traffic flow and the overall development." A.R. Tab 1-F, p. 9. Plaintiffs contend that the Figure 4 Realignment was a practicable alternative and that the Corps' rejection of it was arbitrary because: (1) a rejection on the basis of infringement on the MDOT right-of-way is arbitrary given that the preferred levee alignment also infringes on the MDOT right-of-way, and (2) the City did not sufficiently demonstrate to the Corps that an outer road would be precluded by the Figure 4 Realignment or that an outer road is even necessary. Notwithstanding Plaintiffs' protestations to the contrary, it appears that the Corps considered the Figure 4 Realignment and that the reasons for its

_____

the preferred alternative, well over the minimum requirement of 500 usable acres would have been met. Moreover, the requirement that "about" 1,200 to 1,400 total acres be available would have been met by Alternative C, which would have protected a total of 1,190 acres. A.R. Tab 2-C, p. 3.

This is not enough, however, to authorize the Court to overturn the Corps' decision to reject Alternative C. Even if the Corps had not considered inadequate acreage as a reason for rejecting Alternative C, Alternative C was rejected for at least two other reasons which were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

[33]A borrow pit is "an excavated area where material (as earth) has been borrowed to be used as fill at another location." *Webster's Third New Int'l Dictionary* at 257 (1993).

It appears that the Figure 4 Realignment proposal was an effort to avoid at least some of the impact to the MDOT borrow lake. The preferred alternative appears to impact approximately 40.4 acres of the borrow lake. It appears from the map that the Figure 4 Realignment would have avoided impact to about one-half to two-thirds of the lake area. The Court notes that the borrow lake is classified as an "open water," and not as a "wetland." A.R. Tab 1-F, p. 3.

rejection are sufficiently clear.[34] As explained above, the argument regarding the MDOT right-of-way is not persuasive because it fails to take into account the reality that the different alternative alignments and designs each impact the right-of-way in their own specific ways and to varying degrees. Moreover, though Plaintiffs might believe that the Figure 4 Realignment would not cause significant traffic concerns, the City convinced the Corps that the Figure 4 Realignment would present traffic problems. The Corps was entitled to consider the City's traffic and safety concerns in evaluating the permit application. Based on the Administrative Record before the Court, the Court is unable to conclude that the Corps' decision to reject the Figure 4 Realignment was arbitrary, capricious, an abuse of discretion, or not in accordance with the law.

      iii.    <u>Undesignated Realignment</u>

In addition to the Figure 4 Realignment, the Corps also considered the Undesignated Realignment. The Undesignated Realignment was rejected "because of its [e]ffect on the layout and function of the proposed outer road . . . [and because it] required additional curves in the outer road with undesirable curvatures [which the City felt] could result in an adverse impact to the overall safety and traffic capacity required for the appropriate economic development and functioning of the project subsequent to its construction and operation." A.R. Tab 1-F, p. 9. Another reason for rejection was that the alignment "could also preclude the construction of another planned interchange with Highway 370, which would be essential to future development." A.R. Tab 1-F, p. 9. The Corps was entitled to consider safety and logistical issues in rejecting the Undesignated Realignment. Here, the Corps

---

[34]In this instance, the Corps' explanation for rejecting the Figure 4 Realignment is again brief. This lack of detail, and that neither the Corps nor the City have responded directly to Plaintiffs' argument concerning the Figure 4 Realignment, make the Court's review more difficult. Nonetheless, the Court has concluded that the Corps' path reasonably may be discerned without having to resort to speculation.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

considered the City's concerns regarding the Project's outer road, the curvature of the road, the impact on safety and traffic capacity, and the impact on future development opportunities. Notwithstanding Plaintiffs' claim to the contrary, the Corps' decision to reject the Undesignated Alternative was not arbitrary, capricious, an abuse of discretion, or otherwise unlawful.[35]

Importantly, this Court cannot substitute its judgment for that of the agency. *See Central S.D. Coop.*, 266 F.3d at 895. The Court may not base its judgment on whether it would have come to a different conclusion based on the information contained in the Administrative Record. Instead, it must determine whether the Corps examined the data relevant to a practicable alternatives analysis and whether it has articulated an explanation for its decision based on a rational connection between the facts found and the choice made. *See Motor Vehicle Mfrs.*, 463 U.S. at 43; *Overton Park*, 401 U.S. at 416. After examining several alternatives in relation to the Project's purpose, the Corps concluded that the City had met its burden of demonstrating that, given cost, technological, and logistical considerations, the overall project purpose could not be achieved on an alternative site with less damage to the aquatic ecosystem or floodplain. Though the Court might not have reached the same conclusion as that ultimately adopted by the Corps, the Court cannot say that there has been a clear error of judgment. It appears that all identified alternatives were considered, including those advocated by Plaintiffs, and that the alternative sites were rejected for reasons stated in the EA.[36] The

---

[35]Plaintiffs argue that the rejection of the Undesignated Realignment was arbitrary because any future highway interchange would be located in a different area and would not have any impact on levee configurations in the northern half of the project area. Assuming *arguendo* that Plaintiffs are correct, this alone is not enough to render the Corps' decision arbitrary or capricious because the Corps provided other reasons for rejecting the Undesignated Realignment.

[36]The Court notes that several of the specific concerns now presented by Plaintiffs do not appear to have been presented during the public comment period when the Corps was considering whether the City had met its burden of demonstrating that no practicable alternatives were

Corps' decision to reject other alternatives was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Therefore, Defendants are entitled to summary judgment on Counts I, II, and III, and those counts will be dismissed.[37]

B.     Count IV

In Count IV, Plaintiffs state that the CWA requires that a jurisdictional waters "delineation" in the area of a proposed project be performed in order "to ensure that all impacts are accounted for and that all alternatives are considered to avoid such impacts." Compl. ¶ 91. Plaintiffs allege that, in this case, "[t]he area that would be surrounded by the levee includes approximately 121 acres of wetlands that the Corps acknowledges exist, but does not acknowledge will be impacted by the project." Compl. ¶ 92. According to Plaintiffs, "[t]he Corps' failure to acknowledge impacts to the 121 acres of interior wetlands violated the Clean Water Act . . . [and] [t]he Corps' decision to issue the City a 404 permit without accounting for the interior wetlands was not in accordance with law and is arbitrary and capricious." Compl. ¶ 94-95.

In support of their Motion for Summary Judgment, Defendants point out that Volume 6 of the Administrative Record contains the Corps' wetland delineation and jurisdictional maps. See A.R. Tabs 6-A and 6-D. They further note that the Corps addressed wetlands protection issues in the EA,

_____

available. By presenting specific ideas at this juncture that were not presented at an earlier time and then intimating that the EA should have responded to these specific concerns, Plaintiffs appear to fault the EA for not responding to arguments not presented at the time the EA was written. Although Plaintiffs may attempt to demonstrate that the Corps' decision was arbitrary, Plaintiffs cannot now be permitted to second-guess the Corps' analysis by pointing to an infinite number of other concerns not previously presented to the Corps which Plaintiffs now say the Corps should have considered.

[37]Defendants argue that Count III should be dismissed because Executive Order 11988 does not create a private cause of action. Because the Court has determined that Count III should be dismissed on other grounds, the Court need not address this argument.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

stating that the Project area contains eleven wetlands, plus the MDOT wetland mitigation site, and the MDOT borrow lake. A.R. Tab 1-F, p. 20. The EA describes the impacts to these identified wetlands and concludes that "[t]he impacts to wetlands in the project area should not be adverse, given their condition[, and] [o]n-site mitigation should adequately compensate for the proposed wetland impacts." A.R. Tab 1-F, p. 24. *See also* A.R. Tab 1-F, p. 25. Plaintiffs do not address Defendants' arguments with respect to Count IV, and Plaintiffs have failed to meet their burden of coming forward with any evidence or specific facts showing that there is any genuine dispute as to any material fact regarding this issue. A review of the Administrative Record reveals that the Corps properly considered the wetlands in the Project area and properly determined that they will not be adversely impacted by the construction of a levee. The Corps' wetland delineation was not arbitrary, capricious, an abuse of discretion, or otherwise unlawful. Therefore, Defendants are entitled to judgment in their favor with respect to Count IV, and Count IV will be dismissed.

C.    Counts V and VI[38]

Counts V and VI are based on an allegation that the Corps failed to properly consider the cumulative impacts of the Project. In Count V, Plaintiffs allege that an EA must include a discussion of the environmental impacts of a proposed action and that it must evaluate the cumulative impacts

[38]At the hearing on Plaintiffs' Motion for Temporary Restraining Order, the Chief of the Corps' Regulatory Branch provided certain testimony concerning the Corps' consideration of cumulative impacts that Plaintiffs now wish the Court to consider in the context of their current Motion for Summary Judgment. Generally, the APA "confine[s] judicial review to the administrative record." *Voyageurs Nat'l Park Assoc. v. Norton*, 381 F.3d. 759, 766 (8th Cir. 2004). However, outside evidence which explains something already contained in the administrative record may be considered under certain narrow circumstances. *See, e.g., Arkla v. Texas Oil*, 734 F.2d 347, 357 (8th Cir. 1984). In this case, the Administrative Record is sufficiently clear and does not require further explanation. Therefore, the Court will review the Corps' decision based on the extensive record developed in this case, in accordance with the APA requirements. The proffered testimony from Mr. McClendon will not be considered.

of a project on the environment. Compl. ¶ 98-99. According to Plaintiffs, the EA fails to comply

with the National Environmental Policy Act ("NEPA") because: (1) "it does not provide any analysis

of the cumulative impacts on flooding of the City's project when combined with numerous other levee

and development projects in the Mississippi and Missouri River floodplains," Compl. ¶ 101; (2) "it

does not address questions raised by agencies and the public about the accuracy of the flood model

used by the City, Compl. ¶ 102; and (3) "it does not describe the full extent of indirect impacts to

wetlands that will be caused by the project . . . [in that it] does not disclose that the project will

actually damage or destroy the 121 acres of wetlands that will be encircled by the levee and new

drainage ditches, Compl. ¶ 103. Count V alleges that these failures violate NEPA and that the

decision to issue the Permit based on the EA was arbitrary, capricious, or otherwise not in accordance

with law.[39] In Count VI, Plaintiffs state that the CWA Section 404 Guidelines require the Corps to

evaluate the cumulative impact of flooding and that the Corps failed to do the required cumulative

impacts evaluation. Compl. ¶¶ 109, 110.

NEPA's goals include the promotion of "efforts which will prevent or eliminate damage to

the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. To

facilitate this and other goals, NEPA requires that all agencies prepare an Environmental Impact

Statement ("EIS") for any "major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C). To determine whether an action "significantly" affects the

---

[39]Count V also states that NEPA requires that an EA include a consideration and disclosure of alternatives to the proposed project and alleges that the Corps failed to properly consider or disclose the availability of alternatives that would have reduced the impact on the environment. Compl. ¶ 100, 104. Because this allegation has been addressed previously, the Court need not address it again here. Defendants are entitled to summary judgment with respect to this portion of Count V.

quality of the human environment, thereby necessitating the preparation of an EIS, an agency may first prepare an EA. 40 C.F.R. § 1501.4. In the EA, the environmental impacts of a proposed action should be considered, taking into account the direct, indirect, and cumulative impacts of the action. *See* 40 C.F.R. §§ 1508.9(b),[40] 1508.25.[41] To determine the scope of its environmental impact statement, an agency should consider actions which may be "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). If an agency concludes that the action will not have a significant effect on the environment, it may prepare a Finding of No Significant Impact ("FONSI") and forgo preparation of an EIS. 40 C.F.R. §§ 1501.4(c)-(e), 1508.13. An agency's decision not to prepare an EIS must be affirmed if it "took a 'hard look' at the project, identified the relevant areas of environmental concern, and made a convincing statement for its FONSI." *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir. 1998) (internal quotation marks omitted). An agency takes the requisite

---

[40]An EA must "include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

[41]"To determine the scope of environmental impact statements, agencies shall consider . . . [i]mpacts, which may be: (1) Direct: (2) indirect; (3) cumulative." 40 C.F.R. § 1508.25.
    Direct effects "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).
    Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable . . . [and] may include growth inducing effects and other effects related to induced changes in the pattern of land use, population or density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b).
    Cumulative impact refers to "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

"hard look" at the environmental consequences if it prepares a detailed statement "from which a court can determine whether the agency has made a good faith effort to consider the values NEPA seeks to protect." *Mid States Coalition for Progress v. Surface Trans. Bd.*, 345 F.3d 520, 533-34 (8th Cir. 2003) (internal quotation marks omitted). An agency must take its own hard look at environmental issues because "NEPA mandates a case-by-case balancing judgment on the part of federal agencies. In each individual case, the particular economic and technical benefits of planned action must be assessed and then weighed against the environmental costs." *Calvert Cliffs' Coord. Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971).

In addition to NEPA's requirements, the general regulatory policies of the Corps require a consideration of "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1). In making its determination, the agency should consider

> [a]ll factors which may be relevant to the proposal . . . including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

*Id.*

In the instant case, the Corps stated to the public that "[t]he decision whether to issue a permit will be based on an evaluation of the probable impact including cumulative impacts of the described activity on the public interest." A.R. Tab 1-C, Public Notice, p. 3. In Section II of the EA, entitled "Environmental and Public Interest Factors Considered," the Corps addressed the impacts of the Project. The Corps acknowledged that "[t]he proposed project is located in the Mississippi River

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

flood plain and in the designated Federal Emergency Management Agency (FEMA) floodway." A.R. Tab 1-F, p. 16. The EA reflects the Corps' ultimate conclusion that "[f]looding should not be an adverse impact as a result of the construction of the proposed levee." A.R. Tab 1-F, p. 16. In reaching its decision, the Corps noted that Jacob's Civil, Inc., a local engineering firm working on behalf of the City, had completed a hydraulic study of the Project using accepted methodology established by FEMA and concluded that the Project could be constructed without increasing the 100-year regulatory floodway elevation. A.R. Tab 1-F, p. 16. The Corps further noted that the City had submitted other hydraulic analyses "to address concerns raised by the Corps regarding potential project induced increases to flood heights and the potential to negatively impact the adjacent St. Peters Old Town Levee and Spencer Creek floodway." A.R. Tab 1-F, p. 17. The Corps' Hydraulics Branch reviewed and verified the analyses offered by the City. Tab 1-F, p. 17. Further, "professionally certified members of the Corps Hydraulics Branch also conducted an independent hydraulic analysis of the project's potential impacts on flood heights."[42] Tab 1-F., p. 17. This independent analysis "p[rovided further assurance that the proposed levee would have no hydraulic impact on other areas upstream, downstream, or across the river from the proposed project." Tab 1-F, p. 18. According to the Corps' analysis, "[t]he project should not induce adverse flooding

_____

[42]The Corps' independent analysis "showed a .02 foot increase for the 100-year flood for one cross section located at river mile 230.02 at the St. Peters Old Town Federal Levee, and a 0.01-foot increase to a number of locations upstream of the proposed levee." Tab 1-F, p. 17. "Additional [modeling] efforts [which would take into account the Project's open water improvements and levee riverside embankment] could reduce the impact of the proposed levee to 0.00 feet for the 100-yr flood[, but a] rise of 0.02 feet was not considered enough to necessitate the additional effort of modeling the proposed open water improvements and levee riverside embankment." Tab 1-F, p. 17-18.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

impacts within the project area, or inside or outside of the proposed levee."[43] Tab 1-F, p. 18.

In subsection F, entitled "Summary of Secondary and Cumulative Effects," the Corps summarized the potential indirect, secondary, and cumulative impacts of the Project. With regard to flooding impacts, it was determined that such impacts, "individually, and in conjunction with other Section 404 and Section 10/404 permit actions is minimal."[44] A.R. Tab 1-F, p. 39. The EA concludes that "the proposed project actions are not expected to have an adverse direct, cumulative or secondary [e]ffect on local flood control or flood plain functions." A.R. Tab 1-F, p. 40. Thus, the Corps concluded there would be no significant direct, indirect, or cumulative impacts. As Plaintiffs correctly point out, this portion of the EA also includes what appear to be some contradictory statements. For example, the EA states that "the Corps does not regulate flood plains; FEMA, State Emergency Management Agency (SEMA), and local municipalities control the regulations regarding flood plains and flood plain development permits" and "[c]umulative impacts due to levees cannot be directly tied to the Corps Regulatory Mission." A.R. Tab 1-F, p. 40. Further, after concluding that the proposed project actions would not be expected to have an adverse effect on flood control or flood plain functions, the EA states that "[t]he cumulative impacts of levees and fill in the flood plain should be accounted for through FEMA flood plain development regulations." A.R. Tab 1-F, p. 40.

A thorough review of the EA indicates that the Corps did identify the areas of relevant

---

[43]The EA further states that "[t]he proposed project should not affect flood heights on tributaries such as Spencer Creek or Dardenne Creek." Tab 1-F, p. 18.

[44]In reaching this conclusion, the Corps apparently examined historical permitting in the Upper Mississippi River flood plain as part of its analysis regarding flood plain development impacts. *See* A.R. Tab 1-F, p. 39.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

environmental concern and that it took a hard look at each of these areas in accordance with its NEPA obligations. The vast majority of the discussion contained in the EA indicates that the Corps conducted a thorough review of the effects of flooding, including the cumulative effects of flooding, in accordance with its obligation under the law.[45] After its own review of the issue, the Corps was convinced that the Project would not cause any increase in flood levels or have an adverse impact on flooding, directly, secondarily, or cumulatively. Plaintiffs appear to take issue with the Corps' methods of evaluating the cumulative impacts of the Project and with the Corps determination as to which aspects of the Project's cumulative effects on flooding deserved the Corps' focus. The Corps did take a hard look at impacts, including cumulative impacts, of the Project using accepted evaluative methods. Neither NEPA nor the Corps' permitting regulations require the Corps to conduct any particular type of cumulative impact assessment. Indeed, the applicable law simply mandates that cumulative impacts be considered. This Court cannot substitute its judgment for that

---

[45]In addition, the corps had the benefit of the City's response to public comments concerning the effects of the Project on flooding, including the City's analysis concerning floodplain storage:

> Based on typical durations of large Mississippi River floods, the floodplain storage displaced by the project is negligible when compared to volume of the flood hydrograph. As an example, the 100-yr flow along this river reach is 420,000 cubic feet per second (cfs). Floods of this magnitude usually occur over a period of several weeks or longer, as they rise above flood stage, reach the flood crest and recede below flood stage. For a flow of 400,000 cfs over just a five-day period near the flood peak, roughly 4 million acre-feet of water would flow past the project site. The floodplain storage impacted by this project is about 24,000 acre-feet. This represents only 0.6% of the five-day average flow described above and an even smaller percentage of the entire flood hydrograph. Therefore, the assertion that the project will have a significant adverse impact to floodplain storage and a consequential impact to the flood peak/hydrograph relationship is not warranted.

A.R. Tab 1-H, p. 4.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

of the agency, and it cannot permit Plaintiffs to substitute theirs. *See Central S.D. Coop.*, 266 F.3d at 895. The Corps' determination of the extent and effect of the cumulative impacts of the Project on flooding is entitled to some deference. *See Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) ("determination of the extent and effect of [cumulative impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the [agency]"). Further, though the EA does contain some inconsistent and confusing statements concerning the Corps' responsibility regarding the evaluation of cumulative impacts on flooding, these statements do not negate that the Corps did consider cumulative impacts.[46] The Corps independently verified that the Project would not cause any rise in flood levels and concluded that there would be no adverse cumulative effect on flooding. It cannot be said that the Corps' decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (court will uphold less than clear decision if agency's path may be discerned). Therefore, Defendants are entitled to summary judgment with respect to Counts V and VI, and those counts will be dismissed.

Because Plaintiffs have failed to demonstrate that the Corps' decision to issue the Permit to the City was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,

---

[46]As Plaintiffs point out, an agency cannot abdicate its NEPA authority by relying on another agency's compliance with NEPA as a justification for its own failure to consider environmental impacts. *See Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 484 (D.D.C. 1994); *Calvert Cliffs' Coord. Comm., Inc.*, 449 F.2d at 1122. The Corps' statement that other agencies are responsible for regulating floodplains is not an incorrect statement, but it could be interpreted as an indication that the Corps believes it can rely on these other agencies to consider the flooding impacts of the Project. This, of course, would be contrary to law. In this case, because the Corps did examine the cumulative effects of flooding and because there is no indication that the Corps actually relied upon any determination made by the other agencies to which the Corps referred in the EA, there is no basis for concluding that the Corps improperly abdicated its NEPA authority by relying on another agency's compliance with NEPA.

the Corps' decision must stand. Thus, Defendants are entitled to judgment in their favor on all six counts of the Complaint.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant St. Peters's Motion for Summary Judgment [doc. #27] and Defendant United States Army Corps of Engineers' Motion for Summary Judgment [doc. #29] are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Missouri Coalition for the Environment Foundation's Motion for Summary Judgment [doc. #32], Plaintiff Great Rivers Habitat Alliance's, Baldwin Land Company's, and Over and Under Land Company's Motion for Summary Judgment [doc. #35], and Plaintiff City of O'Fallon's Motion for Summary Judgment [doc. #36] are **DENIED**.

An appropriate Order of Judgment shall accompany this order.

Dated this 3rd day of April, 2006.

_E. Richard Webber_

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

PDF created with FinePrint pdfFactory trial version www.pdffactory.com